# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### JANUARY SESSION, 1999

| | | |
|---|---|---|
| **JAMES R. BOYD,** | ) | **C.C.A. NO. 01C01-9802-CR-00057** |
| | ) | |
| Appellant, | ) | |
| | ) | |
| | ) | **DAVIDSON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. WALTER C. KURTZ** |
| **STATE OF TENNESSEE,** | ) | **JUDGE** |
| | ) | |
| Appellee. | ) | (Post-Conviction) |

ON APPEAL FROM THE JUDGMENT OF THE
CRIMINAL COURT OF DAVIDSON COUNTY

FOR THE APPELLANT:

ROBERT J. MENDES
Cummins Station, Suite 507
209 Tenth Avenue South
Nashville, TN 37203

GLENN DUKES
306 Gay Street, Suite 400
Nashville, TN 37201

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

KAREN M. YACUZZO
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

VICTOR S. JOHNSON
District Attorney General

NICHOLAS BAILEY
Assistant District Attorney General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN 37201

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

This is an appeal as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. The Defendant, James R. Boyd, appeals from the order of the trial court denying him post-conviction relief. We affirm the denial of relief by the trial court.

In February of 1991, the Defendant was convicted by a jury of first degree murder and was sentenced to life in prison. On direct appeal to this Court in 1993, we affirmed the trial court's decision, and the Tennessee Supreme Court denied permission to appeal on October 3, 1994.[1] The Defendant subsequently filed a petition for post-conviction relief, which was denied by the trial court in January of 1996. He then filed a notice of appeal to this Court. By order dated July 3, 1997, this Court remanded the matter to the trial court "for a factual finding regarding [the Defendant's] contention that his trial counsel failed to communicate the state's plea offer." On remand, the trial court concluded that trial counsel had communicated the State's plea offer to the Defendant.

The Defendant contends that he received ineffective assistance of counsel at trial. He argues that his counsel was ineffective for failing to: (1) communicate a plea offer; (2) request a jury instruction on self-defense; (3) call "certain material witnesses" to testify; and (4) inform him regarding the possible penalties for first degree murder.[2]

---

[1] State v. James R. Boyd, No. 01C01-9109-CR-00281, 1993 WL 488322 (Tenn. Crim. App., Nashville, Nov. 24, 1993).

[2] We address the Defendant's arguments in a different order than that presented in his brief.

For an understanding of the testimony and issues raised at the post-conviction hearing, we find it necessary to briefly summarize the events underlying the Defendant's present conviction.[3] Before the death of the victim, Rick L. Lemay, the Defendant and the victim maintained a somewhat turbulent relationship. They met through a mutual friend, and shortly thereafter, the victim began to make frequent trips to the Defendant's apartment. The two developed a friendship and often drank together. The victim, who was characterized at trial as an alcoholic, often became excessively intoxicated, which led to several encounters with the Defendant.

On one occasion in the summer of 1989, the victim became intoxicated while visiting the Defendant, and the Defendant decided to take him to the victim's mother's home, where the victim was then living. Upon arriving, the Defendant assisted the victim into his bedroom and then attempted to leave. The victim, who wanted to remain with the Defendant, resisted, trying to follow the Defendant back to his car. The victim's mother testified that she watched while the Defendant hit her son on the shoulders in an attempt to subdue him.[4] The victim then jumped on the hood of the Defendant's car while the motor was running. The Defendant yanked the victim off the car and shoved him into a chaise lounge on the porch before rushing back to his vehicle to leave.

On another occasion, just eleven days before the victim's death, the victim stopped by the Defendant's apartment for a visit. While the two men drank

---

[3]    The facts are summarized from the opinion of this Court on direct appeal. For a more detailed account of the facts, see State v. James R. Boyd, No. 01C01-9109-CR-00281, 1993 WL 488322 (Tenn. Crim. App., Nashville, Nov. 24, 1993).

[4]    At trial, the Defendant denied hitting the victim.

together, the victim expressed a desire to move into the Defendant's apartment, but the Defendant refused the request. This apparently angered the victim, and a struggle ensued. According to the Defendant, the victim "swung" at him, and he responded by twisting the victim's arm behind his back and transporting him to the door, where he pushed the victim out of the apartment. The victim began to bang on the door, and the Defendant called the police. While the Defendant waited for the police to arrive, the victim crashed through his front window and attacked him, attempting to choke him. The Defendant was able to subdue the victim and again pushed him out the door. Again, the victim attempted to come into the apartment through the front window, and the Defendant informed him that if he did so, he "would have to hurt him." The police arrived shortly thereafter.

Sergeant Steve Reed, who responded to the call, testified that when he arrived at the apartment, there were indications inside that a struggle had taken place. According to Reed, the Defendant told him that he "didn't want [the victim] in his apartment, and that if he were to try to gain entry again he would shoot him." However, the Defendant denied making any such statement.

The Defendant agreed to prosecute the victim for his actions and for the damage done to his apartment. The victim was arrested and taken to jail that night, and the Defendant obtained a warrant against the victim for the damage done to the apartment. A court date was set, but the Defendant failed to appear, and the warrant was therefore dismissed.

The next and final encounter between the victim and the Defendant occurred on October 18, 1989, the date of the victim's death. At trial, the

Defendant described the events that transpired on October 18 as follows: That night, while the Defendant was alone in his apartment, the victim began knocking on the Defendant's door and calling his name. The Defendant testified that he recognized the victim's voice and did not respond. He stated that there was "some guy" with the victim who he never actually saw. The Defendant testified that there was simultaneous banging on his front door and on the back bedroom window.

The Defendant called the victim's mother at approximately 12:30 a.m.,[5] told her that the victim "was no longer welcome in [his] home and [he] didn't want him over there anymore," and threatened to call the police. She told him to call the police if he found it necessary. The victim's mother, who also testified at trial, claimed that during their conversation, the Defendant told her, "I'm drunk as he is but I'm not acting crazy as he is."

According to the Defendant, he called the police, and during the conversation, he heard "a crash in the bedroom window." He went to his bedroom to retrieve his pistol and then went into the spare bedroom where he had heard the crash. He testified, "at that time, I saw the venetian blinds raise up, as though someone were coming through the window. So I said, '[I]f you come through the window, I'm going to shoot.'" At that point, the victim apparently retreated. The Defendant stated that he next heard banging on the front door, went to the door, "shook the doorknob," and said "I've got a gun and I'm coming out." He stated that when he opened the door, he saw a car drive

---

[5] The time of the call was reported by the victim's mother, who also testified at trial.

away and saw the victim. The Defendant testified, "[The victim] bent down, as though he was going to pick up a weapon. And when he raised up, I shot him." He testified that he feared for his life because of the previous incident that occurred shortly before the night of the crime.

Upon arriving at the apartment, the police found the victim lying to the right of the Defendant's front door and the Defendant standing in the doorway. The Defendant admitted that he shot the victim. The victim, who died before police arrived, sustained several bullet wounds—five entry wounds and two exit wounds. Three of the wounds were in his back. No weapons were found in the vicinity of the body, and no blood was found on the inside facing of the door to the apartment, indicating that the door was shut when the victim was shot. Aside from the broken bedroom window, there were no signs of a struggle inside the apartment.

At trial, Annie Cannon, the Defendant's upstairs neighbor, testified that she was awakened on the night of the victim's death to the sound of knocking on the Defendant's bedroom window and that she heard the victim saying, "James, let me in; James I love you." She recalled that she heard the sound of a window breaking and then heard a gunshot.

At the post-conviction hearing, Annie Cannon testified that on the night of the shooting, she saw a black male inside a car outside her apartment with the victim. On direct examination, she stated that although she was never contacted by the defense at the time of trial, she would have been available to testify. However, on cross-examination, she admitted that she had spoken on the phone

prior to trial with one of the defense attorneys, and she testified that she indicated to the attorney that she didn't particularly care for the Defendant.

Carl Pulley, a prosecutor in this case, testified that plea negotiations were "heightened" in this case and that the State made a number of offers to the Defendant prior to trial. He stated that the Defendant was "available and present" during the times that the prosecutors communicated offers to the Defendant's attorney. Pulley testified, "So he was fully aware of what the offers were." He testified that on the night prior to trial, the prosecutors offered the Defendant six years in return for a plea of voluntary manslaughter. He testified that Mr. Thompson, the Defendant's attorney, replied that he "could not speak on behalf of his client that evening," and therefore waited to resolve the matter until morning.

Glenn Dukes, the Defendant's attorney for the post-conviction proceedings, testified that he contacted Pulley while preparing for the case. He maintained that Pulley "state[d] that he clearly remembered a six-year offer in return for a plea of voluntarily [sic] manslaughter was made on the night before the trial and at Mr. Thompson's home. He stated that Mr. Thompson rejected the offer summarily . . . . He also stated that [the Defendant] was not there and there was [sic] no conversations between them."

Cathleen Bush, the Defendant's sister, testified that she went to the Defendant's apartment on October 18, 1989 after the shooting. She stated that

while she was there, "a lady upstairs"[6] approached her and told her "that the other guy got away." She also testified that she accompanied her brother numerous times to meet with the Defendant's attorneys before the trial. She stated that neither she nor her brother was ever made aware of the six-year offer in return for a plea of voluntary manslaughter.

The Defendant also testified at the post-conviction hearing. He stated that at the time of the crime he was employed as a counselor for abused and runaway teenagers at the Middle Tennessee Mental Health Institute. With regard to the night of the murder, the Defendant testified that the victim was accompanied by another man, who was banging on his front door while the victim attempted to enter his bedroom window. He claimed that there were "footprints on the door when [it was] checked," which he maintained verified his version of events. He stated, "when I walked out on the front porch of my apartment is when I saw the man and he was threatening me."

In addition, the Defendant testified that Brett Thompson, his trial counsel,[7] did not inform him that he could receive a life sentence if he were convicted. He claimed, "There was no indication that a jury would convict me, that I would be incarcerated or given a life sentence in prison. . . . Nobody told me that I was facing a life sentence for self-defense." He claimed that Thompson did not explain the plea bargaining process to him and that he was never informed of the six-year offer for a plea of voluntary manslaughter. However, despite his claim

---

[6] She stated that the woman was not Annie Cannon. However, she could not otherwise identify the woman.

[7] The other attorney that represented the Defendant at trial, Carlton Petway, was deceased at the time of the post-conviction hearing.

that he did not understand the plea bargaining process, he admitted that he had previously been in court six times for misdemeanor charges.

The Defendant further testified that Thompson's attitude changed when he became unable to make payments for his legal services. The Defendant stated, "[Thompson] brought me to court in front of [the judge] and asked to be removed from the case because I wasn't being cooperative. When he said I wasn't being cooperative, that means he wasn't getting the money that he asked for." In addition, he stated that he never told any of the attorneys involved in the trial—neither the prosecutors nor the defense attorneys—that he would not entertain plea-bargain offers or that he only wanted a trial.

In contrast to the Defendant's testimony, Thompson testified that he felt "absolutely" sure that the Defendant made an informed, conscious decision to go to trial. He stated that he discussed with the Defendant the indictment, the discovery process, the Defendant's taped statement to police, legal strategy—including how recent changes in the law could affect his case, the range of punishment for the crime with which the Defendant was charged, and the possible consequences of going to trial. He stated that Petway, the other defense counsel, "made it very clear" to the Defendant that his chances of winning on a theory of self-defense were "50/50." Thompson also testified that negotiations with the prosecutor regarding possible pleas "were substantial." He maintained that the Defendant seemed to understand both the six-year offer and the possible consequences of refusing the offer, and he testified that he told the Defendant that the six-year offer was "a good offer." In addition, he testified that

the Defendant "was present" in his office at the time that Pulley communicated the State's final offer of six years and that the Defendant rejected the offer.

Thompson also testified that he filed twelve or thirteen motions in limine, hired a detective to investigate the crime scene, and indicated that although he "paid out over ten thousand [dollars]," he "never received even 10 percent of" the fifteen thousand dollars[8] that the Defendant agreed to pay for his representation. He reported that he did file a motion to withdraw as counsel, "not because of money," but because the Defendant "would not cooperate, he either wasn't present, he was late or he would call at the last minute and say that he wasn't going to come."

With regard to trial strategy, Thompson testified that he saw Annie Cannon at the scene of the crime, that the investigator who he hired interviewed Ms. Cannon and reported back details of the interview to him, and that he believed that Petway, his co-counsel, had also interviewed Cannon. He reported that Annie Cannon was not called as a witness because "she was really one of the major hostile witnesses." Although he admitted that self-defense was a "crucial element" of the case, he stated that he "could not recall off the top of [his] head" why no jury instruction on self-defense was given.

Finally, Thompson admitted that he was no longer practicing law because he had been suspended approximately one year after this case for misappropriation of trust funds. He also admitted that he had recently been

---

[8] The actual fee included "expenses up to twenty thousand dollars." Thompson later stated that he eventually received "roughly twelve fifty on the case."

charged with misappropriation in a case which was still pending at the time of the post-conviction hearing. He explained that it was simply a case of "oversight and neglect" and that the checks at issue in the case had been signed "by somebody in [his] office."

In determining whether counsel provided effective assistance at trial, the court must decide whether counsel's performance was within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To succeed on a claim that his counsel was ineffective at trial, the Defendant bears the burden of showing that his counsel made errors so serious that he was not functioning as counsel as guaranteed under the Sixth Amendment and that the deficient representation prejudiced the Defendant, resulting in a failure to produce a reliable result. Strickland v. Washington, 466 U.S. 668, 687 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). To satisfy the second prong, the Defendant must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding his guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994) (citing Strickland, 466 U.S. at 694).

When reviewing trial counsel's actions, this Court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Counsel's alleged errors should be judged at the time they were made in light of all facts and circumstances. Strickland, 466 U.S. at 690; see Cooper 849 S.W.2d at 746.

-11-

## I. COMMUNICATION OF THE SETTLEMENT OFFER

The Defendant first argues that his counsel was ineffective for failing to communicate to him the State's offer of six years for a plea of voluntary manslaughter, and he thus contends that the trial court's ruling on the matter was erroneous. He argues that the court's ruling is "against the weight of the evidence."

If afforded a post-conviction evidentiary hearing by the trial court, a petitioner must do more than merely present evidence tending to show incompetent representation and prejudice; the petitioner must prove factual allegations by a preponderance of the evidence. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1974) (superseded by Tennessee Code Annotated § 40-30-210(f) (requiring clear and convincing evidence)). When an evidentiary hearing is held, findings of fact made by that court are conclusive and binding on this Court unless the evidence preponderates against them. Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993) (citing Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990)).

On remand, the trial court determined that

[t]he petitioner's testimony is not credible given his attendance at several settlement dockets in which his lawyers discussed possible plea agreements with the prosecutor; his attendance at a meeting in his lawyers [sic] office where the prosecutor's [sic] were present and the testimony of his trial attorney. The Court credits trial counsel that the plea offer was conveyed to the petitioner.

After a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's finding that the six-year offer was

conveyed to the Defendant. At the post-conviction proceeding, Thompson, the Defendant's trial counsel, refuted the Defendant's claim that he was not informed of the six-year offer; and testimony by Pulley, the prosecutor at trial, largely substantiated Thompson's assertion. We conclude that this matter is simply one of credibility, which was properly resolved by the trial court. This issue is therefore without merit.

## II. JURY INSTRUCTION

The Defendant next argues that his counsel was ineffective for failing to request a separate jury instruction on self-defense. He states, "This is a particularly glaring error because the defense relied heavily, if not entirely, upon the theory of self-defense."

We note that the following jury instruction was given at trial:

> Included in the Defendant's plea of not guilty is his plea that he was acting in defense of his home or habitation. When an assault or attempted forcible entry is made against a home or habitation, under said circumstances that would create in the mind of a lawful occupant a well-founded and reasonable belief that he is in present and imminent danger of death or great bodily harm at the hands of the attacker, or that the attacker intends to commit a felony therein, then a lawful occupant of a dwelling can use such reasonable force as is necessary, including deadly force, to prevent the intrusion.
> Words alone, no matter how objectionable or assaulting, will not justify the taking of a human life. A person is under no duty to retreat in his own home, Even [sic] if he can safely do so, but may stand his ground and use reasonable force to prevent or stop an invasion of his home or habitation.
> In determining whether the Defendant's use of force in defending his home or habitation was reasonable, you may consider not only his actual use of force, but also all the facts and circumstances leading up to it. Additional factors to consider in deciding whether the use of force was reasonable include any previous threats of the deceased made known to the Defendant; the character of the deceased for violence when known to the Defendant; the animosity of the deceased for the Defendant, as

revealed to the Defendant by previous acts and words of the deceased; and the manner in which the parties were armed, and their relative strength and sizes.

If, from all the facts and circumstances in the case, you have a reasonable doubt whether the Defendant acted in the necessary defense of his home or habitation, then you must find the Defendant not guilty.

With regard to this instruction, the trial judge made the following findings at the post-conviction proceeding:

First of all, the instructions, there may be some minor difference between the instructions on defense of a person and the defense of the habitation. But I don't think it really matters in this case because it seems to me that the legal principles protect the defendant equally as well.

And then if you look at Judge Summer's [sic] analysis of the facts in this case . . . on direct appeal, I don't think that you can come to any other conclusion. Even if there is some distinction it wouldn't matter. But it seemed to me that the defense of a habitation was beneficial to the defense. He relied on it and if I recall, the main argument and his main position was hey, I was in my house; this guy was attacking my house. And that instruction was given to the jury. And if they believed that it was a case of self-defense I think they would have found in the defendant's favor; they didn't.

We acknowledge, as the State points out, that "the petitioner's theory of self-defense was entertwined [sic] with his theory of defending his home." We also note that the instruction which was given does include some language concerning the defense of one's person and thus allowed the jury to consider the Defendant's contention that both he and his property were threatened by the victim's behavior. Under the circumstances of this case, the instruction given was sufficient to allow the jury to fully consider the Defendant's theory of defense, if it had indeed found the facts to be favorable to the Defendant's position.

However, assuming that Defendant's trial counsel erred by not requesting an instruction specifically addressing self-defense, we conclude that the Defendant has not shown any prejudice resulting from the omission of such an instruction. Numerous times throughout the trial, Defendant's counsel clearly advanced a theory of self-defense as a defense for the Defendant's actions. As the trial court concluded, the jury apparently rejected the theory. The Defendant simply has not convinced us that a more thorough instruction would have changed the outcome in this case in view of the instruction given concerning defense of house or habitation.

## III. WITNESSES

Third, the Defendant argues that his counsel was ineffective for failing to call "certain material witnesses" to testify at trial. In his brief, he states,

> By failing to investigate or talk to Annie Cannon and by failing to act or even attempt to act on the information that Kathleen [sic] D. Bush offered, defense counsel did not present crucial corroborating testimony for the jury's consideration. . . . The evidence of material witnesses who were never interviewed by the defense but, because they lived directly above the scene of the incident, could have easily been found. These witnesses also would have provided favorable testimony for the defense, had the defense only contacted them.

With regard to this issue, the trial court made the following findings:

> The other person; I just never remember that as a big issue in the trial. I mean, I don't know that the State even contested the fact that there was another person there at the time. The fact is that Mr. Boyd went out there on the front porch and shot the victim. There was no testimony of Mr. Boyd that he felt eminently [sic] or immediately threatened by this other person and he shot the victim because this other person was also attacking him. . . . [W]hile that other person may have had something to do with approaching the house, it didn't have anything to do with the direct immediate shooting of the victim. And I just don't find any problems there.

Annie Cannon testified that she was contacted by at least one member of the defense team, and she admitted that she told the person with whom she spoke that she did not like the Defendant. Thompson testified that Cannon was not called as a witness because "she was really one of the major hostile witnesses." As previously stated, this Court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). At the time of trial, Thompson determined that Cannon would not have made a beneficial witness for the defense, and we have been presented with no evidence to conclude otherwise. With regard to the other "material witnesses" that lived above the Defendant, we conclude that aside

from testimony by the Defendant's sister that she spoke with an unidentified woman on the night of the crime, the Defendant has produced no evidence to show that any of these witnesses exist or that they would have provided beneficial testimony to the defense at trial. This issue is therefore without merit.

## IV. PENALTIES FOR FIRST DEGREE MURDER

Finally, the Defendant argues that his counsel failed to inform him of the possible penalties for first degree murder. At the post-conviction proceeding, the Defendant claimed that his attorney did not discuss the possible penalties for the crime with which he was charged and testified that he had no idea that he would be convicted or sentenced to life in prison.

At the post-conviction hearing, the trial judge concluded,

Petitioner . . . contends that he didn't know first-degree murder was punishable by a life sentence. I find that not really credible. I mean, even if the defense lawyer didn't tell him, that's the kind of information folks pick up even if they don't hang around the criminal justice system. That's the kind of information you get from the newspapers and TV. And surely when you are charged with first-degree murder you know you are in real, real big trouble.

Despite the Defendant's claim, Thompson testified quite emphatically that he believed the Defendant made a fully informed decision to go to trial, and Thompson specifically stated that he discussed with the Defendant the range of punishment for first degree murder. Again, we conclude that this is a matter of credibility for resolution by the trial judge, and based upon a thorough review of the record before us, we are unconvinced that the trial judge erred by determining that Defendant's counsel informed him of the possible penalties for first degree murder.

-17-

We thus conclude that the Defendant has not shown that he received ineffective assistance of counsel at trial.  Accordingly, the denial of post-conviction relief by the trial court is affirmed.


_____
DAVID H. WELLES, JUDGE


CONCUR:


_____
JERRY L. SMITH, JUDGE


_____
THOMAS T. WOODALL, JUDGE